UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARK R. LAMBERSON,**

      **Plaintiff,**　　　　　　　　　　Case No. 2:09-cv-1070
　　　　　　　　　　　　　　　　　　　JUDGE GREGORY L. FROST
  v.　　　　　　　　　　　　　　　　Magistrate Judge Terence P. Kemp

**COWAN SYSTEMS, LLC, et al.,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' motion for summary judgment (ECF No. 29), Plaintiff's memorandum in opposition (ECF No. 32), and Defendants' reply memorandum (ECF No. 40).[1]  For the reasons that follow, this Court finds the motion well taken.

### I. Background

From June 2, 2008 to March 2, 2009, Plaintiff, Mark Lamberson, was employed as a local tractor-trailer driver for Defendants, Cowan Systems, LLC and Cowan Systems, Inc., working out of the Columbus hub of the Cincinnati terminal.  Plaintiff was originally hired on June 2, 2008, as a night shift truck driver by Timothy Anderson, the Regional Manager and the manager of the Cincinnati terminal.  As terminal manager, Anderson was responsible for hiring drivers, scheduling loads, and managing runs, and had the authority to issue discipline, including

---

[1] All pinpoint references to documents filed on the electronic docket shall be to the original page numbers of the documents involved, not to the page numbers assigned by the electronic filing system.

1

warnings to and terminations of drivers.

During Plaintiff's employment, Defendants employed approximately sixty to sixty-five drivers in Cincinnati and Columbus to drive forty-seven trucks and serve twenty to thirty customers.  One such customer was Coca-Cola, which accounted for approximately seventy percent of Defendants' Cincinnati business and ninety percent of Defendants' Columbus business.  Defendants' routes at this time were somewhat consistent and were subject to customer demand, with Coca-Cola requiring approximately twenty loads per day.

Defendants' daily operations consisted of a dispatcher assigning routes to drivers according to the daily workload, and drivers were instructed to call each day after 3:00 p.m. to receive their daily route assignments.  Dispatchers attempted to compile a "dispatch sheet" containing route assignments by 3:00 p.m. for the next twenty-four hour period—starting at 4:00 p.m. the current day and running until 4:00 p.m. the next day—but dispatchers sometimes were forced to miss this 3:00 p.m. goal due to delays in receiving orders from customers such as Coca-Cola.  According to Anderson, on rare occasions—an estimated fifteen times from 2008 to 2009—drivers received no assignment from dispatch and would return home.

Because Defendants maintained a twenty-four hour schedule, drivers' start times varied and were not structured around formal shifts.  Still, start times could be roughly divided by a "day shift" and a "night shift," corresponding with the time of day during which a driver's duties occurred.  Plaintiff's night shift start time was 5:00 p.m., which required him to travel approximately forty miles each day from Washington Courthouse, Ohio to the Columbus hub. He would occasionally arrive up to one and a half hours early to wait on his "slip seat driver," or the person with whom Plaintiff would share his truck.  Plaintiff would also sometimes need to

wait on this other driver past his start time.

During his employment, Plaintiff accumulated a notable number of absences. Although Defendants assert that Plaintiff's attendance record—missing a total of approximately forty days during his nine-month period of employment—was excessive, Plaintiff claims he never missed work without a legitimate reason. Anderson kept track of driver attendance on a computer spreadsheet and asserts that Plaintiff's absences atypically exceeded those of other drivers. Review of records submitted to the Court indicate that Plaintiff was absent during his employment for approximately twenty-two days for various reasons and for an additional period of approximately twenty days when he had gall bladder surgery; this latter figure appears to include holidays and weekends. Defendants assert that they provided Plaintiff with this leave for his surgery despite the fact that he did not qualify for leave under the Family Medical Leave Act, given that he had only been their employee for five months when he had surgery.

Defendants did not provide Plaintiff with written notice that his absences were becoming excessive. Anderson asserts that he gave Plaintiff three or four verbal warnings regarding his absences beginning in January 2009. The company handbook also addresses absences and requires employees to report on time each day on which they are scheduled to work. Plaintiff admits to signing a form on his first day of work indicating that he had received and understood the policies contained in the handbook, but he claims that he never actually received a copy of the handbook despite repeated requests.

During his employment, Plaintiff requested a position on the "day shift," a start time that would as implied provide for work during the daytime. Three day shift positions apparently became available during Plaintiff's employment with Defendants, but Plaintiff never obtained

3

such a shift.  On February 26, 2009, Plaintiff again asked about transfer to a start time during the day shift, and Anderson told him that he would not receive a day shift position.  Plaintiff then attempted to contact the company president to complain about Anderson, but Plaintiff's voicemail message was forwarded to Vice President Daniel Evans.

Evans spoke with Plaintiff, who explained that he believed he was being unfairly discriminated against because he was not being moved to the day shift.  Plaintiff, an African-American, told Evans that he had been passed over for "advancement" to day shift three times by drivers with less seniority and who were Caucasian.  Evans reassured Plaintiff that he would not be retaliated against for his complaint and that Evans would look into his concerns.

With Plaintiff's permission, Evans contacted Anderson to inquire about the shift issue. Evans asserts that he specifically did not reveal Plaintiff's allegation of discrimination to Anderson to ensure that he did not make Anderson defensive or biased and so that he would be able to obtain a full understanding of the matter.  Anderson also asserts that he did not learn of Plaintiff's discrimination allegations until he received paperwork from the Equal Employment Opportunity Commission ("EEOC") after Plaintiff's employment was terminated.  Anderson allegedly told Evans that Plaintiff was an unreliable driver, that he had missed approximately forty days of work, and that the most reliable drivers were needed during the daytime to make appointments on time during business hours.  Evans made a follow-up phone call to Plaintiff, explaining that the explanation that reliability factors and issues with Plaintiff's attendance had affected the transfer.

The next day, on February 27, 2009, Plaintiff did not report to work.  Plaintiff explains

that he had concluded that Anderson did not have any routes for him to drive that night because he had allegedly called multiple times to receive a route.  Allegedly, Plaintiff had first spoken with Anderson over the phone earlier in the day, and Anderson had told Plaintiff that because it was too early to receive his dispatch assignment, Plaintiff should call back later.  When Plaintiff then spoke with a dispatcher, the dispatcher also told him to call back.  Plaintiff purportedly did, only to learn that the dispatch sheet was not finished.  Plaintiff asserts that he called again later and that when no one answered his call, he left a voicemail message asking for his dispatch assignment.  Plaintiff asserts that his call was never returned.

     Anderson, on the other hand, asserts that Plaintiff had called at approximately 3:00 p.m. and was told that because Coca-Cola's computers were having trouble, the routes were not yet fixed and Plaintiff should call back in an hour for his dispatch assignment.  Anderson apparently left the dispatch office at 4:00 p.m. to attend a meeting in Columbus.  The dispatcher asserts that when Plaintiff called again around 4:00 p.m., he was told to call back in an hour because the dispatch sheet was still being compiled.  The dispatcher admits that the office may have been left unmanned for several minutes at that time, but he alleges that no voicemail was left on the dispatch office phones.

     Plaintiff never learned of his route.  Anderson explains that a route was ready for Plaintiff at 5:00 p.m. that day and that Plaintiff should have called from his truck to receive the assignment.  Plaintiff counters that during his nine months of employment, he had never been instructed to call for his route from his truck after he reported to the Columbus hub and that he had never reported without knowing his route.  Another driver left the dispatch office and went to his truck at approximately 5:00 p.m. to begin the route.  This driver asserts that he attempted

5

to call Plaintiff from his cell phone and left Plaintiff a voicemail message, but that he misdialed the phone number by one digit so that Plaintiff never received the call and voicemail.

Evans and Anderson were both in Columbus at the dinner meeting when Anderson received a phone call informing him that Plaintiff had neither reported for work nor called in. Evans asserts that he told Anderson that it was Anderson's decision as terminal manager as to how to handle Plaintiff's no-call, no-show (neither calling to provide notification of an absence from work nor showing up for work).

When Plaintiff called the dispatch office on March 2, 2009, Anderson told Plaintiff that he was considered a no-call, no-show on February 27 and informed him that he had been terminated for this as well as his absenteeism and reliability issues. Plaintiff apparently recorded this conversation.[2] Plaintiff also had a conversation with Evans on March 2, 2009, during which they purportedly discussed his the no-call, no-show. Plaintiff apparently reasserted his claim of race discrimination, but Evans stated that the termination was Anderson's decision and that he would support it.

After obtaining a right-to-sue letter, Plaintiff initiated this case on November 23, 2007. His Complaint asserts claims for race discrimination and claims for retaliation in violation of Title VII and Ohio Revised Code Chapter 4112. (ECF No. 1 ¶¶ 31-54.) Defendants filed a motion for summary judgment on all claims. (ECF No. 29.) The parties have completed briefing on the motion, which is ripe for disposition.

---

[2] Although Plaintiff alleges that Anderson referred to "recent events" during this conversation, which Plaintiff insists refers to his complaint of discrimination to Evans, Defendants allege that the audio recording of this conversation does not include such language.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B. Analysis

As a threshold matter, this Court must address what evidence is properly before the

Court.  Plaintiff has filed and relies upon the deposition transcripts of Daniel Evans (ECF No. 34), Reed McKinley (ECF No. 36), Timothy Wolfe (ECF No. 37), and Timothy Anderson (ECF No. 38), in addition to Plaintiff's own deposition (ECF No. 35).  In an apparent attempt to comply with Rule 56 and S. D. Ohio Civ. R. 7.2, Plaintiff filed these transcripts and accompanying exhibits both separately and as excerpts submitted with his memorandum in opposition.  Defendants have also submitted and rely upon excerpts of these depositions with their motion for summary judgment.  Plaintiff's deposition transcript lacks an accompanying signed court reporter certification, however, which is an "essential portion[] of [the] transcript[]."  S. D. Ohio Civ. R. 7.2(e).

The error means that the transcript and excerpts of Plaintiff's deposition fail to qualify as proper summary judgment evidence under Rule 56.  *See* Fed. R. Civ. P. 30(f)(1); *Soliday v. Miami County, Ohio,* No. C-3-91-153, 1993 WL 1377511, at *5 n.4 (S.D. Ohio Nov. 22, 1993) (stating that "the Court cannot consider" deposition testimony referenced in summary judgment reply memorandum but not filed with court); *Moore v. Florida Bank of Commerce*, 654 F. Supp. 38, 41 n.2 (S.D. Ohio 1986) (unauthenticated deposition not filed with court is not proper material under Rule 56); *Podlesnick v. Airborne Express, Inc.*, 550 F. Supp. 906, 910 (S.D. Ohio 1982) (depositions not filed with court but referred to in summary judgment memoranda were not considered in court's decision).  *See also Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (discussing unauthenticated deposition extracts).  The Court therefore cannot consider Plaintiff's uncertified deposition transcript.[3]  *See Harris v. City of St. Clairsville, Ohio*,

---

[3] The parties cannot evade the unsigned certification error by seeking refuge in the fact that the Local Civil Rules permit the filing of "deposition excerpts" as attachments to summary judgment memoranda.  *See* S. D. Ohio Civ. R. 7.2(e).  That same rule also requires that

330 F. App'x 69, 71-72 (6th Cir. 2008) (affirming refusal to consider uncertified depositions in summary judgment analysis).

This result is neither harsh nor unexpected in light of the fact that the same core rationale for exclusion has been applied multiple times in this District. *See, e.g., Zep Inc. v. Midwest Motor Supply Co.*, 726 F. Supp. 2d 818, 823 n.3 (S.D. Ohio 2010); *Koch v. County of Franklin, Ohio*, No. 2:08-cv-1127, 2010 WL 2386352, at *7 (S.D. Ohio June 10, 2010); *Weimer v. Honda of America Mfg., Inc.*, No. 2:06-cv-844, 2008 WL 2557252, at *1 (S.D. Ohio June 23, 2008); *Ullman v. Auto-Owners Mut. Ins. Co.*, 502 F. Supp. 2d 737, 744-45 (6th Cir. 2007); *Hinkle v. Norfolk S. Ry. Co.*, No. 2:05-cv-574, 2006 WL 3783521, at *6 n.10 (S.D. Ohio Dec. 21, 2006); *Harris v. City of St. Clairsville, Ohio*, No. C2-04-cv-1179, 2006 WL 3791404, at *4 (S.D. Ohio Dec. 21, 2006); *United States v. Standring*, No. 1:04CV730, 2006 WL 689116, at *4 (S.D. Ohio Mar. 15, 2006).

Moreover, this understanding of the certification requirement is hardly unique to this District. *See, e.g., Romanowski v. RNI, LLC*, No. C 06-6575 PJH, 2008 WL 361125, at *4 (N.D. Cal. Feb. 11, 2008); *Varela v. San Francisco City & Cnty.*, No. C 06-01841 WHA, 2007 WL 205069, at *2 (N.C. Calif. Jan. 25, 2007); *Witherow v. Crawford*, No. 3:01-CV-00404-LRH (VPC), 2006 WL 3845145, at *5 (D. Nev. Dec. 28, 2006); *Roberts v. Boeing Co.*, No. CV 05-6813 FMC (Shx), 2006 WL 4704616, at *1 (C.D. Cal. Sept. 8, 2006); *Gastelum v. Abbott Labs.*,

---

"[e]vidence submitted . . . shall be limited to that necessary for decision and shall include only essential portions of transcripts or exhibits referenced in the memorandum." S. D. Ohio Civ. R. 7.2(e). See also S. D. Ohio Civ. R. 5.4(b) ("All deposition transcripts filed with the Clerk must include . . . the certificate described in Fed. R. Civ. P. 30(f)."). The court reporter certification is an essential portion of a transcript necessary for decision because it qualifies any submitted transcript pages as summary judgment evidence.

No. CV 05-645 PHX NVW, 2006 WL 2456199, at *3 (D. Ariz. Aug. 22, 2006); *AMCO Ins. Co. v. Madera Quality Nut LLC*, No. 1:04-CV-06456-SMS, 2006 WL 2091944, at *24 (E.D. Cal. July 26, 2006); *Magana v. Sacramento Cnty. Main Jail*, No. CIVS03-2061DFLKJMP, 2006 WL 314486, at *3 (E.D. Cal. Feb. 9, 2006).

Also before the Court and lacking a court reporter certification is a purported transcript of a recorded telephone conversation between Plaintiff and Tim Anderson in which Anderson fired Plaintiff.[4] (ECF No. 29-10.) The Court recognizes that "[b]ecause the transcript relied on here is unauthenticated, it is inadmissible." *Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985 (S.D.N.Y. 1984).

Having resolved the issue as to what this Court can consider in its Rule 56 analysis, the Court turns to whether the viable summary judgment evidence in the record entitles Defendants to judgment as a matter of law. This leads into the issue of which claims necessitate analysis.

Plaintiff's Complaint set forth a claim for race discrimination under Title VII, a claim for race discrimination under Ohio Revised Code Chapter 4112, a claim for retaliation under Title VII, and a claim for retaliation under Ohio Revised Code Chapter 4112. Defendants sought summary judgment on all the claims in their motion. In his memorandum in opposition, Plaintiff responds in part by stating that "[a]fter the benefit of extensive discovery and review of Defendants' Motion for Summary Judgment, [Plaintiff] does not oppose summary judgment on his race discrimination claim." (ECF No. 32, at 1.) Because the federal and state law race discrimination claims employ the same standards, the Court recognizes that Plaintiff must have

---

[4] The Court notes that the audio version of the conversation is before the Court by joint submission of the parties. *See* Ecf Nos. 27 & 31.

intended his reference to claim in the singular to cover both forms of the race discrimination component of this litigation together; otherwise, it would make no sense to acquiesce to judgment on one race discrimination claim but not the other. Therefore, by agreement of the parties, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's race discrimination claims.

This leaves for discussion Plaintiff's retaliation claims under federal and state law. Count Three of the Complaint is a retaliatory discharge claim, apparently under 42 U.S.C. § 2000e-3(a). Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any [employee] with respect to the [employee's] compensation, terms, conditions, or privileges of employment, because of such [employee's] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is considered an unlawful employment practice if an employer discriminates against an employee because "the [employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The employee has the burden of proving a *prima facie* case demonstrating that the employer unlawfully retaliated against the employee.[5]

---

[5] Count Four then asserts a state law retaliatory discharge claim under Ohio Revised Code § 4112.02(I). That statute provides:

> It shall be an unlawful discriminatory practice:
> . . .
> (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to

11

To establish a *prima facie* case of unlawful retaliation under Title VII, the employee must present by a preponderance of evidence that: (1) the employee was engaged in a protected activity; (2) the employer knew that the employee was engaged in this protected activity; (3) the employer subsequently took an employment action adverse to the employee; and (4) a causal connection between the protected activity and the adverse employment action exists. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Strouss*, 250 F.3d at 342 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). The Sixth Circuit has held after a plaintiff has proven the existence of a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Abbott,* 348 F.3d at 542 (citing *Nguyen*, 229 F.3d at 562). If the defendant can meet this burden, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason was mere pretext. *Abbott*, 348 F.3d at 542 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). If the plaintiff demonstrates that the defendant's proffered reasons were pretextual, then the fact finder may infer unlawful retaliation. *Abbott*, 348 F.3d at 542.

Defendants move for summary judgment on multiple grounds, including the arguments that Plaintiff cannot establish that he engaged in any protected activity and that he cannot establish that his employer knew that he was engaged in a protected activity. Plaintiff's theory is

---

4112.07 of the Revised Code.

Ohio Rev. Code § 4112.02(I). The Sixth Circuit has recognized that the standards for Title VII and § 4112 claims are the same. *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 828 (6th Cir. 2000) (citing *Little Forest Medical Center of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609-10, 575 N.E.2d 1164, 1167 (1991)).

that he was discharged in retaliation for his complaining to Daniel Evans about alleged race discrimination underlying Plaintiff's failure to obtain a shift change.  Assuming arguendo that Plaintiff did engage in a protected activity to satisfy the first prong of a *prima facie* case of retaliation, Plaintiff cannot satisfy the second prong.

Evans testified in his deposition that after speaking with Plaintiff about the discrimination allegations, he called Tim Anderson but specifically did not mention the purported discrimination:

> Q	When you spoke to Mr. Lamberson or Mr. Anderson, did you make him aware that you received a phone call from Mark Lamberson?
> A	Yeah.  Yeah.  I told him that I talked to Mr. Lamberson and that he had expressed a concern about, you know, moving from night shift to day shift.
> Q	Okay.  Did you make him aware that Mr. Lamberson indicated that he had been discriminated against, or that he felt like he was being discriminated against?
> A	No, not at all.
> Q	Okay.  And why is that?
> A	Well, you know, I'll be honest with you.  If there was any type of discrimination, I certainly didn't want to, you know, make Tim defensive.  I wanted to get to the root of the issues.  So I acted as if it was just a simple issue or problem with changing shift. And try to get an unbiased response from Tim.
> Q	Okay.  So from your perspective, it was intentional, but you did not make him aware that Mr. Lamberson had complained about discrimination?
> A	That is correct.
> Q	Okay.  But you did make him aware that Mr. Lamberson had a complaint about not being put on a first shift?
> A	Yes.

(ECF No. 34, Evans Dep., at 62-64.)  This account tracks Anderson's summary of the events in question.

Anderson testified in his deposition as follows:

13

Q. Now, you were – at the time, on the 27th, you were aware when you were talking to Mr. Lamberson, that he had called corporate the day before to complain about you, right?

A. At which time? What time of day?

Q. When you talked to him on the 27th, you already knew, okay, whenever you talked to him, you had already known that the day before, he had called corporate.

A. I knew in the afternoon, yes.

Q. No. You knew before that. You knew on the 26th that he had called corporate, the day before?

A. Yes.

Q. Right. And you knew that because Dan Evans called you and told you that Mr. Lamberson had called to complain?

A. Correct.

Q. How many conversations did you have with Mr. Evans on the 26th?

A. I believe there were two.

Q. Okay. All right. And what do you remember about those conversations?

A. Mr. Evans called and said, "I got a message on mark Lamberson saying you won't give him a chance on day shift. What's going on? Can you give me any details so I know what I'm doing?" And I explained to him that Lamberson constantly asks for day shift and that his attendance and his reliability would not warrant me doing that.

Q. Okay. And what do you remember about the second conversation?

A. Second conversation, I remember Mr. Evans calling back and saying, "Tell me what it is that you're looking at." And I pulled this up and said, "The guy has missed over 40 days of work in six or seven months. And that my day shift guys had appointments and times." And he said, "I understand." And I said, "I can't have somebody on days that I cannot depend on." And, basically, that was the main part of the conversation that I recall.

Q. Okay. I mean, did you tell him that over half the days were due to his gall bladder surgery?

A. No.

Q. Okay. And you're aware from reading Mr. Evans' deposition testimony, that Mr. Lamberson made a complaint of discrimination?

A. I'm aware, after reading it. I wasn't aware of it at the time.

Q. When did you become aware that he had made a complaint of discrimination to Mr. Evans?

14

> . . .
>
> Q. When did you become aware that Mr. Lamberson had made a complaint of discrimination?
>
> A. To the best of my memory, I remember when I got the papers from the EEOC.
>
> Q. Okay. Has anybody else filed a charge of discrimination? Any of your other truckers filed a charge fo discrimination, since you've been at Cowan?
>
> A. No.
>
> Q. And you'd deny that Mr. Evans told you that Mr. Lamberson had made a discrimination complaint?
>
> . . .
>
> Q. Do you deny that Mr. Evans told you that Mr. Lamberson complained about discrimination?
>
> A. Yes. Mr. Evans did not tell me.

(ECF No. 38, Anderson Depo. at 124-27.) This testimony tracks Evans' deposition account of his not disclosing the discrimination allegation to Anderson.

Defendants are correct that the Evans-Anderson testimony punctures Plaintiff's case. The Sixth Circuit has held that "[t]he decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007). Absent direct or circumstantial evidence suggesting that Anderson knew of Plaintiff's allegation of race discrimination, there is no possible issue of fact as to whether Anderson terminated Plaintiff's employment as an act of retaliation. Plaintiff asserts that such circumstantial evidence exists and suggests that "a jury could conclude that Anderson knew of Lamberson's protected activity when he terminated Lamberson." (ECF No. 32, at 12.) But Plaintiff has failed to put forth any circumstantial evidence that would permit a reasonable jury to find in his favor on this issue.

In an attempt to create an issue of fact, Plaintiff points to Anderson admitting that Evans

15

had told him that Plaintiff had complained about him. Review of Anderson's deposition transcript fails to reveal, however, that this admission conceded knowledge of the race discrimination allegation:

> Q. Obviously, you're aware that Mr. Lamberson called corporate on you, correct?
> A. Yes.
> Q. Okay. And you're aware of that because Mr. Evans called you and told you that, right?
> A. Correct.

(ECF No. 38, Anderson Depo., at 56.) Citing to this testimony and to evidence suggesting that there were multiple conversations between Evans and Anderson prior to Plaintiff's termination, Plaintiff concludes that "[a] jury does not have to believe Anderson's claim that he was unaware of [Plaintiff's] discrimination complaints when he made the termination decision and frankly the denials are not credible given that Evans' and Anderson's affidavits to the EEOC are riddled with inconsistencies and misstatements of fact." (ECF No. 32, at 13.) Plaintiff also concludes that "[a] jury could reason that Evans would not call Anderson a second time after his conversation with [Plaintiff] unless it was to convey new information that [Plaintiff] had complained that Anderson's shift assignments were discriminatory." (*Id.*) The problem with Plaintiff's argument is that it substitutes speculation for actual evidence.

The Sixth Circuit has previously rejected the proposition that speculation can substitute for evidence, explaining:

> To survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions. *Mulhall*, 287 F.3d at 552 (holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that decisionmaker had no

16

> knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56" (citing *Visser v. Packer Eng'g Assocs., Inc* ., 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (holding that summary judgment was appropriate where the inferences plaintiff sought to draw from evidence were akin to "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience"))).

*Frazier*, 250 F. App'x at 148. *See also Proffitt v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 150 F. App'x 439, 443 (6th Cir. 2005) (affirming grant of summary judgment for employer on knowledge prong of retaliation test where plaintiff's "evidence [was] too speculative to support the inference that [the decisionmaker] knew of [plaintiff's] protected activity when she terminated her"). Such reasoning informs the instant case. Plaintiff has offered an argument that a jury *could* disbelieve Anderson because Evans and Anderson *might* have discussed the discrimination allegation as a *possibility* inferred only from more than one conversation having occurred. This is not sufficient to establish a *prima facie* case under the circumstances present here.

Plaintiff reaches a contrary conclusion, relying in part on *Briordy v. Chloe Foods Corp.*, No. 3:07-0295, 2008 WL 587503 (M.D. Tenn. Feb. 29, 2008). In that case, another district court judge in this Circuit addressed whether a plaintiff had satisfied the knowledge prong when the defendant claimed that the decisionmaker who terminated the plaintiff's employment had not known that three days prior the plaintiff had told an allegedly harassing individual that they needed to have a strictly professional relationship. The district court declined to enter summary judgment in part because there was evidence that the decisionmaker had participated in several phone calls on the day of the plaintiff's termination with an individual involved in the alleged harassment, the conversations included discussion of the plaintiff's future with the company, and

17

the person speaking with the decisionmaker may have had an influence on the termination decision. *Id.* at *7.

The non-binding *Briordy* case is distinguishable. Moving beyond the mere fact that *Briordy* also features multiple phone conversations, an in-context review of that authority reveals that its rationale offers little to inform today's decision. The company decisionmaker in *Briordy* spoke with the plaintiff's direct supervisor, an individual who was allegedly sexually harassing the plaintiff. In addition to the phone contact upon which Plaintiff relies, the district court in *Briordy* expressly cited numerous *other* facts as relevant to the denial, including that the plaintiff asserted that she had never received from the defendant company any information on how to address harassment, that it was unclear whether the company even had a sexual harassment policy when the plaintiff worked there, and the fact that the purportedly harassing supervisor had allegedly prohibited the plaintiff from talking to anyone but him at the company. *Id.* In other words, the phone conversations were but one part of a significantly larger combination of facts that *together* resulted in the denial of summary judgment on the knowledge prong.

There is no analogous set of circumstances in the instant case. Here, there is *only* Plaintiff's speculation as to what might have happened and his suggestion that the actual evidence presented could be found not credible. This is not enough. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) ("Mulhall argues in response that none of these statements [denying knowledge and communication of knowledge] are credible, but he has failed to produce any evidence, direct or circumstantial, to rebut these denials. Mulhall offers only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56.").

Defendants are therefore also entitled to summary judgment on Plaintiffs' retaliation

claims.  *See Lyle v. The Cato Corp.*, 730 F. Supp. 2d 768, 780 (M.D. Tenn. 2010) (granting summary judgment in employer's favor where decisionmaker never knew of plaintiff's complaints of racial discrimination); *Hicks v. SSP Am., Inc.*, No. 1:09CV1619, 2010 WL 3522446, at *4-5 (N.D. Ohio Sept. 7, 2010) (granting summary judgment in employer's favor where there was no evidence that the decisionmaker knew that plaintiff had filed an EEOC charge).  Having concluded that Plaintiff's retaliation claims fail on the knowledge prong, this Court need not and does not address Defendants' moot alternative arguments for summary judgment.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment.  (ECF No. 29.)  The Clerk shall enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost  
GREGORY L. FROST  
UNITED STATES DISTRICT JUDGE